1
2

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

3
4

UNITED STATES OF AMERICA,

5
                               Plaintiff,

       vs.

6

PCPLV LLC, *et al*.,

7
8
                            Defendants.

Case No.: 2:21-cv-00184-GMN-DJA

### ORDER GRANTING, IN PART, MOTIONS TO DISMISS

9      Pending before the Court is the Motion to Dismiss, (ECF No. 92), filed by Defendant

10 PCPLV LLC d/b/a Pinnacle Compounding Pharmacy ("Pinnacle").[1]  Plaintiff United States of

11 America (the "Government") filed an Errata Response, (ECF No. 117), to which Pinnacle

12 replied, (ECF No. 123).  Further pending before the Court is the Motion to Dismiss, (ECF No.

13 93), filed by Defendants Ofir Ventura, Cecilia Ventura, and Brandon Jimenez (collectively the

14 "Individual Defendants").  The Government filed a Response, (ECF No. 116), to which the

15 Individual Defendants replied, (ECF No. 123).  Defendants Robert Gomez, Gomez &

16 Associates, Inc., Rock'n Rob Enterprises, Ivan Lee Goldsmith, AS Enterprises, Inc., and Amir

17 Shalev filed joinders. (*See* Joinders, ECF Nos. 95–96, 103–106, 111, 124).  For the reasons

18 discussed below, the Motions to Dismiss are GRANTED, in part, and DENIED, in part.

19 **I.**     **BACKGROUND**

20      This action arises out of alleged kickback schemes between marketers, physicians, and a

21 pharmacy. (*See generally* Compl., ECF No. 1).  Between February 2015 and November 2015,

22 Defendants Ofir Ventura and Cecilia Ventura (collectively referred to as "the Venturas") and

23 Brandon Jimenez, were all co-owners and members of Defendant Pinnacle, a compounding

24

25

---

[1] Also pending before the Court is the Unopposed Motion for Leave to file Excess Pages, (ECF No. 91), filed by
Pinnacle.  For good cause appearing, the Unopposed Motion for Leave to file Excess Pages is GRANTED.

pharmacy. (*Id.* ¶ 2). The Complaint alleges that the owners and members of Pinnacle knowingly and willfully engaged in illegal kickback schemes. Those schemes involved causing Pinnacle to pay substantial kickbacks to various third-party marketers in exchange for those marketers arranging for the referral of prescriptions for compounded drugs to Pinnacle. (*Id.*). The alleged kickbacks paid to these marketers consisted of a substantial share of the revenue that the marketers' referrals generated for Pinnacle. (*Id.*). The Complaint also alleges that physicians Goldsmith and Shalev participated in kickback schemes. (*Id.* ¶¶ 17–19). The Government alleges these arrangements, described in more detail below, violate the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), which forms the basis for its claim brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*

**A. Pinnacle, the Venturas, and Jimenez's Relationship with Third-Party Marketers**

Pinnacle, at the direction of the Venturas and Jimenez, allegedly entered into agreements with independent third-party marketers, pursuant to which those marketers were paid substantial kickbacks to generate prescriptions for compounded drugs, including compounded topical creams, and arrange for those prescriptions to be referred to Pinnacle by inducing physicians to prescribe compounded prescriptions for payment. (*Id.* ¶¶ 46, 68–69). Pinnacle could then seek payment from a patient's insurance, including TRICARE and CHAMPVA. (*Id.*). The Venturas and Jimenez agreed for Pinnacle to pay those marketers substantial portions of the revenue, including TRICARE and CHAMPVA revenue, that the marketers successfully generated for the pharmacy as a result of those referrals. (*Id.* ¶ 47). The Venturas and Jimenez agreed to pay these marketers substantial kickbacks because of the large volume of referrals the marketers could bring to Pinnacle. (*Id.*). As a result of these relationships, Pinnacle received prescriptions for, and shipped compounded drugs to, patients located throughout the United States. (*Id.*).

**B. Gomez, Gomez & Associates, Inc., and Rock'n Rob Enterprises Referral to Pinnacle**

Defendant Robert Gomez, in his individual capacity and as owner of Gomez & Associates, Inc., and Rock'n Rob Enterprises, was among the third-party marketers (and the only named third-party marketer) that allegedly knowingly and willfully received illegal kickbacks from Pinnacle through his corporate entities. (*Id.* ¶ 3). Gomez, and his businesses Gomez & Associates, Inc. and Rock'n Rob Enterprises, market topical compounded prescription creams and other pharmaceutical products directly to patients. (*Id.* ¶ 14–17). Pursuant to agreements between Pinnacle and Gomez, (*see id.* ¶ 48–49), the Government alleges that Gomez carried out campaigns to directly solicit patients, including TRICARE beneficiaries and beneficiaries of the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), to accept prescriptions for compounded medications, and arranged for those prescriptions to be referred to Pinnacle, which agreed to pay substantial kickbacks in return. (*Id.* ¶ 3). To implement this scheme, Gomez recruited and paid other third-party marketers to help him find TRICARE and CHAMPVA beneficiaries who would be willing to try the compounded medications from Pinnacle. (*Id.* ¶ 61). In order to induce TRICARE and CHAMPVA beneficiaries to try Pinnacle's compounded medications, Gomez and his third-party marketers would allegedly offer beneficiaries kickbacks in the form of financial compensation ranging from $150–$220, upon information and belief paid from Gomez's corporations, for agreeing to receive compounded medications from Pinnacle. (*Id.* ¶ 62). These payments would often be made in cash after the TRICARE or CHAMPVA beneficiary received his or her first prescription from Pinnacle in the mail and were knowingly and willfully made in violation of the AKS. (*Id.*).

Another method Gomez used to refer prescriptions for compounded medications to Pinnacle involved asking TRICARE and CHAMPVA beneficiaries if they could photograph

the beneficiaries' military identification cards. (*Id.* ¶ 63). Gomez would also obtain the beneficiaries' social security numbers. (*Id.*). This information was then provided by Gomez to physicians, including Goldsmith and Shalev, who were involved in the kickback scheme. (*Id.*).

### C. Pinnacle and Gomez's Relationship with Dr. Goldsmith and Dr. Shalev

In addition to Pinnacle's kickback arrangements with Gomez, the Government alleges that Pinnacle also entered into kickback arrangements with physicians directly, including Defendant Amir Shalev, D.P.M., in which Shalev knowingly and willfully received compensation, through AS Enterprises, from Pinnacle and/or Gomez for writing prescriptions for compounded medications. (*Id.* ¶ 68). Pinnacle made these kickback payments to Shalev through AS Enterprises, an entity in which Shalev holds an ownership interest and is a director. (*Id.*). Ofir Ventura and Jimenez also invited physicians to attend dinners at Pinnacle's expense, including Defendant Ivan Lee Goldsmith, M.D., and Shalev, in order to allegedly induce the physicians to prescribe compounded medications from Pinnacle. (*Id.*).

Gomez likewise knowing and willfully entered into kickback arrangements with Goldsmith and Shalev, in which he would share a percentage of his commission from Pinnacle with Goldsmith and Shalev in exchange for the physicians prescribing compounded medications from Pinnacle. (*Id.* ¶ 69). The Government pleads upon information and belief, that Gomez knowingly and willfully paid and Goldsmith knowingly and willfully accepted cash for these referrals at Goldsmith's request. (*Id.*). And Gomez, through his corporations, provided payments to Shalev through Shalev's family business, AS Enterprises, which Shalev knowingly and willfully accepted in exchange for the prescriptions which resulted in payment from TRICARE and CHAMPVA. (*Id.*).

Gomez also provided these physicians pre-printed prescription pads prepared by Pinnacle to assist the physicians in writing numerous prescriptions for Pinnacle's compounded medications. (*Id.*). Goldsmith and Shalev, would then issue prescriptions for compounded

medications from Pinnacle for TRICARE and CHAMPVA beneficiaries without ever meeting with the beneficiaries or establishing a physician-patient relationship. (*Id.* ¶ 65).  TRICARE and CHAMPVA beneficiaries who were induced to accept Pinnacle compounded medications through Gomez, Shalev, and Goldsmith were usually not required to pay a co-pay for the medications, even though co-pays are required under TRICARE and CHAMPVA's respective policies and waiver of co-pays constitutes an illegal kickback. (*Id.* ¶ 65).  Further, when TRICARE and CHAMPVA beneficiaries would return unrequested compounded medications to Pinnacle, those returned medications were typically not discarded, which was proper procedure, but were instead provided to Gomez, who would in turn give the returned medications as "samples" for Goldsmith. (*Id.* ¶ 71).

Plaintiff alleges that even the small number of TRICARE and CHAMPVA beneficiaries who were actual patients of Shalev and Goldsmith largely did not discuss a need for compounded medications, did not request or discuss compounded medications with their physician, and did not know why they received compounded medications in the mail from Pinnacle. (*Id.* ¶ 74).  Goldsmith would also give patients multiple tubes containing compounded medications from Pinnacle at his office directly without providing the patients with a prescription for the compounded medication and without the patients actually requesting the compounded medications. (*Id.*).  These compounded medications would subsequently be billed to TRICARE and CHAMPVA. (*Id.*).

### D. The Government's Claims Against Defendants

Through these alleged schemes, the Government alleges that Defendants knowingly presented and/or caused to be presented claims to the TRICARE and CHAMPVA programs that were false or fraudulent because they were tainted by kickbacks to marketers, physicians, and patients, did not arise from a valid prescriber-patient relationship, and were otherwise unnecessary. (*Id.* ¶ 5).  As a result of this conduct, the Government brings the following claims

against Defendants: (1) violation of the FCA based on violations of the AKS; (2) Payment by Mistake; and (3) Unjust Enrichment.  Defendants move to dismiss all claims alleged against them.

## II.    LEGAL STANDARD

Dismissal is appropriate under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555.  Accordingly, FRCP 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged. *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  In other words, the complaint "must include 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quoting *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir.

2007) (per curiam)) (internal quotations omitted).  Rule 9(b)'s particularity requirement ensures that defendants are on "notice of the particular misconduct. . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (quoting *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

If the court grants a motion to dismiss, it must then decide whether to grant leave to amend.  The court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant. . . undue prejudice to the opposing party by virtue of. . . the amendment, [or] futility of the amendment. . . ." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

## III.  DISCUSSION

Defendants' arguments for dismissal can be grouped into three categories: (1) the Complaint does not meet the particularized pleading standard required by FRCP 9(b); (2) the Complaint does not sufficiently plead the elements of an FCA claim under FRCP 9(b) and 12(b)(6); and (3) the Complaint does not sufficiently plead the state law claims under FRCP FRCP 9(b) and FRCP 12(b)(6). (*See generally* Pinnacle Mot. Dismiss, ECF No. 92); (*see also* Individual Defts.' Mot. Dismiss, ECF No. 93).  The Court will address each argument made by the Defendants within those categories below.

### A.  The Complaint Meets the Particularized Pleading Standards of FRCP 9(b).

The parties do not dispute that the FCA claim at issue here is subject to the heightened pleading standard set forth in FRCP Rule 9(b). (Pinnacle Mot. Dismiss 7:18–20); (Resp. to Pinnacle 2:18–26).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  That is, the plaintiff must include "the who, what, when, where, and how" of the fraud. *Vess*, 317 F.3d at 1106.  Defendants set forth a total of six

arguments for why the Complaint fails to meet the particularized pleading standards of FRCP 9(b).

First, Pinnacle argues that the heart of the Complaint is improperly pled "upon information and belief." (Pinnacle Mot. Dismiss 16:26 (citing Compl. ¶¶ 4, 56, 57, 70, 76, 77, 85)). Under FRCP 9 the pleader is not required to allege facts that are "peculiarly within the opposing party's knowledge," and allegations "based on information and belief may suffice," "so long as the allegations are accompanied by a statement of facts upon which the belief is founded." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)). Here, for the matters peculiarly within the opposing party's knowledge, the Government provides a sufficient factual basis for its beliefs as described in its Response. (*See* Resp. to Pinnacle 10:7–13:2). As an example, Pinnacle argues that paragraph 76 of the Complaint lists, without proper factual support, "sample claims submitted by Pinnacle to TRICARE or CHAMPVA for prescriptions written by Shalev and for which, upon information and belief, Shalev knowingly and willfully received a kickback." (Pinnacle Mot. Dismiss 17:3–6). But Pinnacle's Motion ignores that paragraphs 77 and 78 present two tables showing the specific kickback payments from the submitted claims that Pinnacle and Gomez gave to AS Enterprises. As such, although paragraph 76 was pled upon information and belief, paragraphs 77 and 78 provide the factual basis for the allegations. Because the Government provides a sufficient factual basis for its beliefs throughout its Complaint, it is not improperly pled upon information and belief.

Second, Pinnacle argues that the Complaint fails to allege with particularity how and why the unidentified prescriptions were "unnecessary." (*Id.* 18:4–5). Federal healthcare programs such as Medicare condition reimbursement on whether services are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). So,

for the Government's FCA claim to survive the pleading stage, it must allege that the prescriptions were unnecessary, which the Court finds it did.

The Complaint alleges that Pinnacle paid illegal kickbacks to AS Enterprises to induce Shalev to continue writing numerous prescriptions for expensive and unnecessary compounded medications from Pinnacle. (Compl. ¶ 4). For example, the Complaint describes how Shalev, "without first meeting with Patient I and/or establishing a physician-patient relationship with Patient I" wrote prescriptions for compounded medications. (*Id.* ¶ 76). "Patient I did not know why she received the compounded medications and did not request or otherwise order any compounded medications from Pinnacle." (*Id.*). Yet, from "approximately July 2015 through approximately August 2015, Pinnacle filled seven prescriptions in total for Patient I." *Id.* The Complaint also alleges that Patient J reported being sent a "pain cream for her arthritis" that Shalev prescribed despite having never spoken with Shalev and expressing that she was not interested in the medication, and that Patient K received compounded medications that Shalev prescribed, without first meeting Shalev and without requesting any such medications. (*Id.*). Shalev's prescriptions practices, as exemplified by Patient I, J, and K's experiences, support an inference that the prescriptions were unnecessary because the patients neither requested the prescriptions nor understood why they were prescribed.

Pinnacle points out that neither the Medicare statutory scheme nor CMS regulations impose a categorical requirement that patients be seen in person before a prescription may be deemed reimbursable. (Pinnacle Mot. Dismiss 10:14–16 (citing 42 C.F.R. § 410.78)). But the Complaint does not merely allege that Shalev and Goldsmith prescribed medication without seeing patients in person; it alleges that they did so without even speaking with these patients regardless of whether it was in person or online. Pinnacle cites no binding case that establishes

1   it has met its burden under this argument.[2]  The lack of a physician-patient relationship, lack of

2   a meeting between the physician and the patient, and patients' lack of understanding regarding

3   why they received the prescribed compounded medication can support an inference that the

4   compounded medications were unnecessary.  Accordingly, the Complaint contains sufficient

5   factual matter about the unnecessary medications, accepted as true, to state a claim to relief that

6   is plausible on its face and particularly alleged.

7       Third, Pinnacle argues that the limited examples of alleged fraud provided in the

8   Complaint lack the required particularity. (*Id.* 20:9).  The Court disagrees.  An FCA complaint

9   must provide a reliable factual basis to *infer* that specific false claims were submitted as a result

10  of the alleged scheme. *Ebeid ex rel. United States v. Lungwitz,* 616 F.3d 993, 998–99 (9th Cir.

11  2010).  In *Ebeid*, the Ninth Circuit held that while a plaintiff need not always identify every

12  detail of a specific claim, the complaint must contain "particular details of a scheme to submit

13  false claims paired with reliable indicia that lead to a strong inference that claims were actually

14  submitted." *Id.* at 999.  This is "to give [defendants] notice of the particular misconduct which

15  is alleged to constitute the fraud charged so that [they] can defend against the charge and not

16  just deny that [they have] done anything wrong." *Id.*

17      Here, the Complaint provides sufficient detail regarding the alleged fraud that took place

18  through the alleged kickback scheme.  The Government points the Court to an example that the

19  Court finds illustrates that the particularity standard is met.  The Complaint alleges that in May

20  2014, Cecilia Ventura, acting on behalf of Pinnacle, entered into a "Consulting Fee Agreement"

21  with Gomez and Rock'n Rob Enterprises. (Compl. ¶ 48).  It further alleges that the Venturas

22  and Jimenez agreed to share all revenue from prescriptions that Gomez solicited and referred to

23  Pinnacle. (*Id.*).  Specifically, the agreement included language defining the compensation that

24

25

---

[2] Pinnacle cites a Southern District of Texas case, *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex. 2010), which is not binding on the Court, and it otherwise unpersuasive.

Pinnacle would pay to Gomez and Rock'n Rob Enterprises as follows: "thirty-five percent (35%) of the gross amount to reimbursed by insurance companies . . . for prescriptions that come from Consultant's Prospective Accounts that are compounds[.]" (*Id.*).  The Complaint further alleges, for example, that under the terms of the Consulting Fee Agreement, Gomez only received compensation for prescriptions for compounded medications he referred to Pinnacle, but not for non-compounded medications. (*Id.* ¶ 49).  The Complaint provides additional details regarding the Consulting Fee Agreement at paragraphs 48–52, and 84.  All of these paragraphs describe with particularity the fraud the Government alleges occurred through a kickback scheme from the Consulting Agreement.  Thus, the examples of alleged fraud— including the Consulting Fee Agreement kickback scheme and other kickback schemes—in the Complaint are pled with particularity.

Fourth, Pinnacle argues that the Complaint does not identify with particularity a false statement. (Pinnacle Mot. Dismiss 21:9).  But it is possible for the United States to describe an allegedly fraudulent scheme with sufficient specificity to satisfy Rule 9(b) without specifically identifying any false claims.  The Ninth Circuit does not "require the complaint to identify representative examples of actual false claims, though that is one way to satisfy the heightened pleading requirement." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 678 (9th Cir. 2018) (citing *Ebeid*, 616 F.3d at 998–99). Instead, "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Ebeid*, 616 F.3d at 998–99.  Here, as discussed above, the Government did allege sufficiently particular details of the scheme to submit claims in violation of the AKS which is considered a per se false claim for purposes of the FCA.  Then paired with reliable indicia (*i.e.*, the tables the Government provides), leads to a strong inference that the claims were actually submitted.

Thus, the Government meets the Ninth Circuit's FRCP 9(b) pleading obligations for FCA claims.

Fifth, Pinnacle argues that the Complaint fails the particularity standard because it lumps the Defendants together. (Pinnacle Mot. Dismiss 22:9–10). The Individual Defendants also argue that the Complaint impermissibly lumps the Individual Defendants together and fails to establish a foundation for individual liability. (Individual Defts.' Mot. Dismiss 5:20, ECF No. 93). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 764–65. Here, the Complaint has pled with particularity the role and action of each named Defendant in the fraud scheme and has sufficiently differentiated the allegations pertaining to each defendant to inform each Defendant separately of the allegations surrounding their participation in the fraud. (*See, e.g.*, Compl. ¶¶ 3, 5, 14 (describing Gomez, Rock'n Rob Enterprises, and Gomez & Associates' allegations)); (*Id.* ¶ 5 (describing the Venturas and Jimenez allegations)); (*Id.* ¶ 46 (describing Pinnacle's allegations)); (*Id.* ¶ 2 (stating Defendants Ofir Ventura and Cecilia Ventura as well as Brandon Jimenez were all co-owners and members of Pinnacle)); (*Id.* ¶¶ 11–13 (describing Brandon Jimenez, Cecilia Ventura, and Ofir Ventura as actively involved in managing and directing the daily operations at Pinnacle due to their responsibilities as vice principals of Pinnacle)); (*Id.* ¶¶ 12, 48 (Cecilia Ventura's role)); (*Id.* ¶ 85 ("Cecilia Ventura oversaw Pinnacle's submission of false and tainted claims")); (*Id.* ¶ 68–78 (describing Shalev, Goldsmith, and AS Enterprises' roles and liability). Thus, the Government's Complaint does not impermissibly lump the Defendants together and it also pleads the basis for each of the Individual Defendant's liability.

Sixth, Pinnacle contends that the alleged payments to AS Enterprises are stated with ambiguity rather than the required particularity. (Pinnacle Mot. Dismiss 22:19–20). Similarly,

the Individual Defendants argue that the Complaint alleges without particularity that all the Individual Defendants caused Pinnacle or Gomez to pay AS Enterprises.  This argument is unpersuasive for much of the reasons already discussed above.  The Government's Complaint is not ambiguous; it pleads with particularity each Defendants' role and the actions taken in the alleged kickback scheme, including the payments made to AS Enterprises by Gomez and Pinnacle. (*See, e.g.*, ¶ 75–78).

In sum, the Complaint pleads fraud by Pinnacle and the Individual Defendants with the required particularity under FRCP 9(b).  Thus, Defendants' Motions to Dismiss based on the above arguments are DENIED.

### B. The Complaint Sufficiently Pleads All Requisite Elements of an FCA Claim Predicated on AKS Violations

The FCA imposes civil liability for anyone who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).  A "claim" is "any request or demand. . . for money or property" presented to an officer, employee or agent of the United States. 31 U.S.C. § 3729(b)(2).  An FCA claim can be predicated on an AKS violation.

An AKS violation occurs when someone:

> knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a(b)(1)(A), (B).

An AKS violation can also occur when someone:

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to

induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

*Id.* § 1320a(b)(2)(A), (B).  A violation of the AKS that results in a federal health care payment is a per se false claim under the FCA. *Id.* § 1320a(7)(b)(g) ("A claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA].").  Defendants argue that the Complaint does not sufficiently plead the elements of an FCA claim predicated on AKS violations.  The Court takes up each argument in turn**.**

### 1. Scienter

The FCA requires that a defendant act "knowingly," defined as acting either with actual knowledge, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A).  The AKS requires that a defendant act "knowingly and willfully," 42 U.S.C. § 1320a-7(2)(B), but "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [it]," *id.* § 1320a-7b(h).  "Although Rule 9(b) allows plaintiffs to allege scienter generally, scienter must still be pled with plausibility under Rule 8(a)." *Adomitis ex rel. U.S. v. San Bernardino Mountains Cmty. Hosp. Dist.*, 816 F. App'x 64, 66 (9th Cir. 2020) (citation omitted).

Pinnacle argues that the Complaint fails to plead the requisite scienter. (Pinnacle Mot. Dismiss 33:7).  The Individual Defendants also argue that the Complaint fails to state a plausible claim of individual FCA liability because it does not allege any Defendants' personal knowledge or scienter. (Individual Defts.' Mot. Dismiss 9:4–5).  But the Complaint provides many examples that plead each Defendants' scienter satisfying the AKS and FCA.

For example, scienter is sufficiently pled as to Shalev and Goldsmith because the Complaint alleges that they both prescribed compounded prescriptions to patients they did not have a physician-patient relationship with, to patients who did not request the prescribed prescriptions, and to patients who expressed that they did not want a certain prescription that was prescribed. (*See* Compl. ¶¶ 72–73, 75–76).  Pinnacle, the Venturas, and Jimenez's scienter is sufficiently pled where the Complaint alleges that TRICARE and CHAMPVA beneficiaries who were induced to accept Pinnacle compounded medications through Gomez were usually not required to pay a co-pay for the medications, even though copays are required under TRICARE and CHAMPVA's respective policies. (*Id.* ¶ 65).  Another example of Pinnacle, the Venturas, and Jimenez's scienter is the allegation that Pinnacle employees received calls from TRICARE and CHAMPVA beneficiaries informing Pinnacle they did not request any compounded medications and asking for more information as to why they received the unrequested medications. (*Id.* ¶ 58).  At least some of the TRICARE and CHAMPVA beneficiaries who contacted Pinnacle to inquire why they received the compounded prescriptions they did not order were told by Pinnacle's principals or employees that the medications were theirs to keep, free of charge. (*Id.*).  Scienter is further sufficiently pled as to Pinnacle, the Venturas, and Jimenez where the Complaint alleges that TRICARE and CHAMPVA beneficiaries returned unrequested compounded medications to Pinnacle, and those returned medications were typically not discarded, which was proper procedure, but were instead provided to Gomez, who would in turn give the returned medications as "samples" for Goldsmith. (*Id.* ¶ 71).  AS Enterprises' scienter is sufficiently pled because the Complaint alleges that it accepted payments in exchange for Shalev's prescriptions of compounded medications to Pinnacle. (*Id.* ¶ 77).  AS Enterprises had knowledge of Shalev's participation in the alleged kickback scheme because Shalev is the director and owner of AS Enterprises. (*Id.* ¶ 17).  Sufficiently pled examples of Gomez, Gomez & Associates, Inc., and Rock'n Rob

1    Enterprises include the allegations that Gomez received and directed illegal kickback payments

2    though his corporate entities, targeted TRICARE and CHAMPVA beneficiaries, and offered

3    beneficiaries kickbacks in the form of financial compensation ranging from $150-$220. (*Id.* ¶

4    60–62).

5         Each of these examples demonstrates the Defendants acted either with actual knowledge,

6    in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the

7    truth or falsity of the information satisfying the scienter required under the FCA and acted

8    knowingly and willfully to satisfy the AKS.

9    **2. Connection Between Kickback Scheme and False Claims**

10         Generally, the AKS does not require proof of a quid pro quo arrangement, or that any

11    payment or referral was made. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1397 (9th Cir.

12    1995). "When a violation of the AKS forms the basis of an FCA claim, however, the claimant

13    must establish a connection between the alleged kickback scheme and actual false claims

14    submitted to the government." *United States ex rel. Gough v. Eastwestproto, Inc.*, No. CV 14-

15    465 DMG (SHX), 2018 WL 6929332 (C.D. Cal. Oct. 24, 2018). Pinnacle argues that the

16    Complaint does not plausibly or particularly allege that any claims "resulted from" or were

17    caused by alleged kickbacks. (Pinnacle Mot. Dismiss 27:9–10).

18         First, Pinnacle urges the Court to apply either a "but-for" causation analysis adopted by

19    the Eighth and Sixth Circuits or the Third Circuit's test that requires the Government to prove

20    at least one claim was actually paid because of a kickback in order to establish a connection

21    between the alleged kickback scheme and alleged false claims submitted. (Pinnacle Mot.

22    Dismiss 27:18–28, 28:9–13). The Third Circuit case that Pinnacle relies on described the

23    standard at the summary judgment stage, not the pleading stage, so the Court finds the case

24    inapplicable here. Moreover, the Supreme Court has not addressed what constitutes causation

25    under the AKS. Courts are currently split on the issue, and other courts in the Ninth Circuit

have declined to adopt a "but-for" causation standard for FCA claims predicated on AKS violations.  For example, in *United States v. Pac. Dermatology Inst., Inc.*, the court found that "while [the defendants] are correct that under the AKS, claims for items or services 'resulting from' a violation of the AKS constitute a false claim, the Court declines to interpret this as a 'but-for' causation requirement—[the defendants] fail to provide authority that would require such a strict reading of the AKS." *United States v. Pac. Dermatology Inst., Inc.*, 2024 WL 3086586, at *9 (C.D. Cal. May 16, 2024).  Persuaded by that reasoning, and joining other courts in the Ninth Circuit, the Court declines to impose a "but-for" causation requirement.

Courts in this Circuit have required only a "'link,' and [] have found a sufficient causal link 'in cases where the doctor who actually received the alleged kickback then uses the defendant's services." *United States v. Sutter Health*, 2024 WL 4112315, at *6 (N.D. Cal. Sept. 6, 2024) (citing *Kuzma v. N. Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 956–57 (D. Ariz. 2022)); *see United States v. Abbott Lab'ys, Inc*., 622 F. Supp. 3d 920, 933 (S.D. Cal. 2022) (finding sufficient link between the kickback and reimbursement claim where the relator alleged that the defendant assisted the doctor with free marketing and advertising assistance for the purpose of inducing use of its devices).

Here, the Complaint pleads facts showing an alleged quid pro quo arrangement among Defendants which satisfies the "link" needed.  Specifically, that Defendants engaged in an alleged quid pro quo scheme in which Pinnacle would pay Gomez, Gomez & Associates, Inc. and Rock'n Rob Enterprises a kickback compensation amount that was directly tied to the volume and value of prescriptions Gomez referred to Pinnacle. (Compl. ¶ 3, 47–49).  Gomez referred prescriptions to Pinnacle by inducing patients directly and by inducing Shalev and Goldsmith to prescribe unnecessary prescriptions for people with whom the doctors did not have a legitimate doctor patient relationship or to patients who did not request compounded prescriptions. (Compl. ¶¶ 63, 65, 68).  47–49).  Pinnacle would in turn seek reimbursement,

from CHAMPVA and TRICARE, for the prescriptions Gomez referred. (*Id.* ¶ 86).  Gomez also entered into kickback arrangements with Goldsmith and Shalev, in which he would share a percentage of his commission from Pinnacle with Goldsmith and Shalev in exchange for the physicians prescribing compounded medications from Pinnacle. (*Id.* ¶ 69).  Pinnacle also entered into kickback arrangements with physicians directly, including Shalev, in which Shalev received compensation, through AS Enterprises, from Pinnacle and/or Gomez for writing prescriptions for compounded medications. (*Id.* ¶68).  Because the Complaint sufficiently pleads facts regarding the quid pro quo scheme, the Complaint sufficiently pleads the causal "link" required under the AKS to survive Pinnacle's motion to dismiss.

Second, Pinnacle argues that the Complaint must be dismissed because it does not allege that any payment recipient had the authority to unduly influence or select a medical provider, ultimately negating any connection. (Pinnacle Mot. Dismiss 31:1–2).  Pinnacle asks the Court to consider the Fifth Circuit case *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014), which explains that under *United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004) there is a difference between a payer's intent to induce "referrals," which is illegal, and the intent to compensate advertisers, which is permissible. *Id.*  Indeed, *Shoemaker* explicitly stated:

> *Miles* accordingly stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 'the AKS."

*Id.*  The court in *Shoemaker* ultimately found that *Miles* was inapplicable to the matter before it because advertising was not at issue in *Shoemaker* and there was sufficient evidence to establish that the payments made were to induce recommendations.  The latter is true here.  The Government has alleged that the payments to Gomez and his businesses were aimed to induce him to refer prescriptions to Pinnacle by marketing products to patients.  That is, in paying

Gomez and his businesses, Pinnacle was not paying a marketing fee for a brochure bearing Pinnacle's pharmacy name to be distributed to Gomez's patient-clients for example; rather, the Complaint supports an inference that Pinnacle induced a referral by paying a kickback to Gomez for each compounding prescription after Pinnacle submitted a successful false claim and Gomez favored Pinnacle because he received a kickback from Pinnacle when inducing doctors to prescribe unnecessary compounding medications and marketing those unnecessary prescriptions to be filled by Pinnacle in such a way that constitutes the kind of undue influence prohibited by the statute.

Defendants further argue that the Ninth Circuit's July 11, 2025, decision in *United States v. Schena*, 142 F. 4th 1217 (9th Cir. 2025)—that considered *Shoemaker* and *Miles*—forecloses the Government's theory that Defendants violated the AKS per se by paying volume-based sales commissions to independent sales representatives who promoted Pinnacle's services to prescribing physicians. (*See generally* Not. Suppl. Auth., ECF No. 110). Defendants aver that the Government's entire Complaint therefore fails and should be dismissed. (*Id.*).

Though the *Schena* court was considering the Eliminating Kickbacks in Recovery Act ("EKRA"), a different statute than the AKS, the *Schena* court called the provision of the EKRA it was analyzing "analogous" to the provision of the AKS relevant here. *Schena*, 142 F. 4th at 1223. Even so, the holding in *Schena* does not foreclose the Government's case.

In *Schena*, the Ninth Circuit considered what it means to "induce a referral" under the EKRA *Id.* at 1224. The panel considered *Shoemaker* and *Miles* and held that a percentage-based compensation structure for marketing agents, *without more*, does not violate the EKRA. *Id.* Defendants argue that the Government's case therefore fails because it has not alleged anything more than the existence of a percentage-based compensation structure. (Not. Suppl. Auth 3:4–4:12). But the *Schena* court also explained that "when percentage-based payments are made to marketing agents who are directed to mislead those making the referrals about the

nature of and need for the covered medial services, those payments would violate the EKRA." *Id.* at 1226.  To that point, the Government alleges that the Venturas and Jimenez incentivized Gomez to increase both the value and volume of the prescriptions he generated and referred to Pinnacle regardless of patient need. (Compl. ¶ 53).  One way in which Gomez accomplished this goal is by referring prescriptions for formulas that would generate as large of a payment as possible for the pharmacy, and in turn a larger kickback for him, regardless of whether the specific formulation was medically necessary. (*Id.* ¶ 54).  Another way Pinnacle increased the value and volume of the prescriptions was by encouraging employee pharmacists to use more expensive ingredients in its compounded prescriptions, even if less expensive ingredients could be used. (*Id.* ¶ 55).  These examples plead how Gomez was directed to mislead his patient-clients directly and indirectly through Shalev and Goldsmith's role in this matter, about the nature of and need for the prescriptions, satisfying *Schena*.  Thus, if *Schena*'s interpretation of the EKRA applies to the AKS, it does not foreclose the Government's claims here.

### 3.  Materiality

Pinnacle and the Individual Defendants next argue that the Complaint fails to allege that any violation was material to any payment, which they contend is required under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). (Pinnacle Mot. Dismiss 35:4–5); (Individual Defs.' Mot. Dismiss, ECF No. 93).  Pinnacle states that the Complaint only assumes materiality by citing the existence of the AKS and its per se false claim provision.  But courts applying the *Escobar* standard for materiality have held that violations of the AKS are per se material. *See, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("The statute's use of the term 'constitutes' would be meaningless if courts had to engage in a materiality analysis . . . after establishing that a claim resulted from an AKS violation."); *see also United States v. Reliance Med. Sys., LLC*, No. CV 14-06979, 2022 WL 524062, at *4 (C.D. Cal. Feb. 22, 2022) ("[C]ompliance with the Anti-Kickback Statute is

necessarily material to the government's decision to pay Medicare claims. . . ."); *United States v. Marlin Med. Sols. LLC*, No. SA-21-CV-00160, 2022 WL 190308, at *8 (W.D. Tex. Jan. 12, 2022) ("And courts have found AKS violations to be inherently material to the government's decision to pay claims presented. . . . The Court agrees: AKS violations are 'serious, consequential, felony transgressions of law ... precisely the kind of violation[s] the FCA is supposed to reach.'" (citations omitted)). Thus, based on the particular and plausible pleadings that Defendants violated the AKS, the materiality requirement is satisfied for purposes of the pleading stage.

In sum, the Government has plausibly and particularly pled an FCA claim against the Defendants based on AKS violations. Thus, Defendants' Motions to Dismiss the FCA claim are DENIED.

### C. State Law Claims

Defendants next contend that that the Government's common law claims for unjust enrichment and payment by mistake should be dismissed.

#### 1. Unjust Enrichment

All Defendants seek dismissal of the Government's unjust enrichment claim. They argue that the Government should not be permitted to seek such equitable relief where it has an adequate remedy at law under the FCA and that, in any event, the Complaint does not allege any unlawful or unjust conduct. It is unnecessary to address the merits of Defendants' second point because courts do dismiss unjust enrichment claims where an adequate remedy at law is available. *See, e.g.*, *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009) (holding "equitable relief is not appropriate where an adequate remedy exists at law"); *Small v. Univ. Med. Ctr. of S. Nevada*, No. 213CV00298APGPAL, 2016 WL 4157309, at *3 (D. Nev. Aug. 3, 2016) (applying Nevada law to dismiss unjust enrichment claims where a federal law provided relief). Moreover, the Government fails to respond to Defendants' argument to dismiss the

unjust enrichment claim based on this point. LR 7-2(d) ("The failure of an opposing party to file points and authorities in response to any motion, except a motion under Fed. R. Civ. P. 56 or a motion for attorney's fees, constitutes a consent to the granting of the motion."). Thus, Defendants' Motions to Dismiss the unjust enrichment claim are GRANTED. Because amendment would be futile, the Government's unjust enrichment claim is DISMISSED with prejudice against all Defendants.

### 2. Payment by Mistake

The "common law remedy of payment by mistake is available to the United States independent of its statutory remedies." *United States v. Systron-Donner Corp.*, 486 F.2d 249, 251 (9th Cir. 1973). "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414, 415 (1938). "If the government made these payments under an erroneous belief which was material to the decision to pay, it is entitled to recover the payments." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970). Defendants argue that the Government's payment by mistake claim should be dismissed because the Complaint does not describe any specific mistaken belief by the Government apart from implying that the Government paid not knowing of the kickbacks. Defendants state that, to recover on a mistake theory, the Government should detail what the mistake was and how it impacted payment. But Defendants cite no case or authority to support these arguments. LR 7-2(d) ("The failure of a moving party to file points and authorities in support of the motion constitutes a consent to the denial of the motion.").[3]

---

[3] Defendants also argue that the payment by mistake claim fails based on their previously raised arguments regarding the FCA claim. (Pinnacle Mot. Dismiss 41:15–25); (Individual Defts.' Mot. Dismiss 16:26–17:1). But for the reasons discussed above, this claim does not fail based on those arguments. Pinnacle lastly argues that the Court should dismiss the payment by mistake claim to the extent it is based on a freestanding "lack of medical necessity" theory that fails to comply with the "treating physician" rule, under which "the judgment of the treating physician should be given 'extra weight[.]'" (Pinnacle Mot. Dismiss 41:26–42:2 (citing *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1032 (D. Nev. 2006)). But the Court is unpersuaded by Defendants' underdeveloped argument regarding *Prabhu*. The "treating physician" rule focuses on the judgment of a *treating*

Accordingly, Defendants fail to meet their burden and the Motions to Dismiss the claim for payment by mistake are DENIED.

## IV.  **CONCLUSION**

**IT IS HEREBY ORDERED** that Pinnacle's Unopposed Motion for Leave, (ECF No. 91), is **GRANTED**.

**IT IS FURTHER ORDERED** that Pinnacle's Motion to Dismiss, (ECF No. 92), is **GRANTED, in part, and DENIED, in part**.  The Motion is granted as to the Government's unjust enrichment claim but denied as to all other claims.

**IT IS FURTHER ORDERED** that the Individual Defendants' Motion to Dismiss, (ECF No. 93), is **GRANTED, in part, and DENIED, in part**.  The Motion is granted as to the Government's unjust enrichment claim but denied as to all other claims.

**IT IS FURTHER ORDERED** that the Government's unjust enrichment claim is **DISMISSED** with prejudice against all Defendants.

**DATED** this __13__ day of January, 2026.

_____
Gloria M. Navarro, District Judge
United States District Court

---

physician in furnishing their patient items or services.  Here, Plaintiff alleges that Shalev and Goldsmith did not have a physician-patient relationship with many of the beneficiaries.  Thus, the Court finds that "treating physician" rule is inapplicable.